### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MEHLER TEXNOLOGIES, INC.,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant/** | § | |
| **Cross-Defendant,** | § | |
| | § | |
| **NORTHVIEW CHRISTIAN** | § | |
| **CHURCH, INC.,** | § | |
| | § | |
| **Plaintiff/Cross-Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:09-CV-655-M** |
| | § | |
| **MONOLITHIC CONSTRUCTORS, INC.** | § | |
| **d/b/a MONOLITHIC DOME INSTITUTE;** | § | |
| **MONOLITHIC HOLDINGS, INC.;** | § | |
| **MONOLITHIC, INC.,** | § | |
| | § | |
| **Defendants/Counter-Plaintiffs,** | § | |
| | § | |
| **DAVID B. SOUTH;** | § | |
| **SOUTH INDUSTRIES, INC. d/b/a** | § | |
| **SOUTH INDUSTRIES USA, INC.; SOUTH** | § | |
| **INDUSTRIES INTERNATIONAL, INC.;** | § | |
| **RANDY SOUTH; ANDREW SOUTH;** | § | |
| **JOSHUA SOUTH; DEREK SOUTH;** | § | |
| **LPDJ ARCHITECTS, LLC;** | § | |
| **LELAND A. GRAY; JESSE M. HARRIS;** | § | |
| **J & J GROUP, INC.; JASON SOUTH;** | § | |
| **MECHANICAL SYSTEM SOLUTIONS** | § | |
| **GROUP PLLC d/b/a** | § | |
| **ENGINEERING SYSTEM SOLUTIONS;** | § | |
| **ENGINEERING STRUCTURAL** | § | |
| **DETAILING, LLC d/b/a** | § | |
| **ENGINEERING SYSTEM SOLUTIONS;** | § | |
| **MS2EE, PLLC d/b/a** | § | |
| **ENGINEERING SYSTEM SOLUTIONS;** | § | |
| **E & D COMPANY, PLLC d/b/a** | § | |
| **ENGINEERING SYSTEM SOLUTIONS;** | § | |
| **ROYAL ENGINEERING, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## NORTHVIEW CHRISTIAN CHURCH'S ORIGINAL COMPLAINT

NOW COMES NORTHVIEW CHRISTIAN CHURCH, INC. ("NCC") and files this complaint, stating causes of action against MEHLER TEXNOLOGIES, INC. ("Mehler"); MONOLITHIC CONSTRUCTORS, INC. d/b/a MONOLITHIC DOME INSTITUTE and MONOLITHIC HOLDINGS, INC. and MONOLITHIC, INC. and DAVID B. SOUTH in his individual capacity (collectively "Monolithic"); SOUTH INDUSTRIES, INC. d/b/a SOUTH INDUSTRIES USA, INC. and SOUTH INDUSTRIES INTERNATIONAL, INC. and RANDY SOUTH in his individual capacity and ANDREW SOUTH in his individual capacity and JOSHUA SOUTH in his individual capacity and DEREK SOUTH in his individual capacity (collectively "South"); LPDJ ARCHITECTS, LLC and LELAND A. GRAY in his individual capacity and JESSE M. HARRIS in his individual capacity (collectively "LPDJ") (Monolithic, South, and LPDJ are sometimes collectively referred to as the "dome builders"); J & J GROUP, INC. and JASON SOUTH in his individual capacity (collectively "J&J"); MECHANICAL SYSTEM SOLUTIONS GROUP PLLC d/b/a ENGINEERING SYSTEM SOLUTIONS ("MSSG"); ENGINEERING STRUCTURAL DETAILING, LLC d/b/a ENGINEERING SYSTEM SOLUTIONS ("ESD"); MS2EE, PLLC d/b/a ENGINEERING SYSTEM SOLUTIONS ("MS2EE"); E & D COMPANY, PLLC d/b/a ENGINEERING SYSTEM SOLUTIONS ("E&D"); and ROYAL ENGINEERING, INC. ("Royal") (J&J, MSSG, ESD, MS2EE, E&D, and Royal are sometimes collectively referred to as the "engineers"), showing as follows.

For the purposes of this complaint:  (a) "dome builders" means Monolithic, South, and LPDJ (including all associated parties and individual persons as defined above); (b) "engineers" means J&J, MSSG, ESD, MS2EE, E&D, and Royal (including all associated parties and individual persons as defined above); and (c) "Mehler" means Mehler (as defined above).

# I.
## <u>NATURE OF ACTION</u>

1.   NCC is a church that paid the "dome builders" (as defined above) all acting together as a single business or joint venture and in concert as joint tortfeasors millions of dollars to design and construct two dome-shaped buildings in Dothan, Alabama.  The "engineers" (as defined above) assisted the dome builders in designing and engineering the buildings.  One of the most important components of the dome construction was manufactured by Mehler.  Through their acts and omissions, the dome builders, the engineers, and Mehler have breached contracts and/or warranties, and committed tortious acts including negligence and/or fraud.

2.   In approximately one year since substantial completion, the domes have:  (a) <u>roofs</u> with splitting seams (Mehler's product) allowing water to enter, discoloration and fading, problems adhering to underlying surfaces, deteriorating insulation, rusting rebars, and ugly and damaging "repair" attempts using pop rivets and patches that make problems worse; (b) "<u>ring beams</u>" supporting the roofs that have improperly set cement, concrete deterioration such as honeycombing and pitting, mold and mildew, corrosion, ugliness, and rusting rebars; (c) <u>walls</u> with a dry-stacked split-faced block design and construction that falls woefully short of industry standards for exterior walls and allows significant water penetration; and (d) a variety of other significant structural, design, construction, and aesthetic defects.

3.   Water penetrating through splitting roof seams and defects in the walls and ring beams means water can come into contact with rebars in the roofs, ring beams, and walls of the domes.  After entering through the split seams in the roofs, water trickles into the insulation beneath where rebars begin, and follows the rebars into the concrete in the roofs.  Water also trickles down the dome roofs to the supporting ring beams, and enters in at the ring beams themselves, where the water can come into contact with the rebars in the ring beams and follow the rebars

around the circumferences of the ring beams.  Water intrusions in the walls can come into contact with the rebars located in the walls.

4.   Moisture causes rust or oxidation of the rebars wherever they are located, resulting in the expansion of the rebars to many times their original size and causing two key things:  (i) breaking the surrounding concrete loose; and (ii) destroying the structurally critical bond between rebar and concrete.  Because the domes are constructed with zero redundancy, a failure of a section of a ring beam or wall, or of a section of a roof can cause the entire respective dome to collapse.  Concrete can also be released before a complete collapse happens, such as from the dome roofs down to where people sit, stand, and walk below.

5.   Repairing the problems is commercially impracticable.  The three fundamental problems are the roofs, ring beams, and walls, none of which can practicably be repaired.  The dome builders have already attempted, unsuccessfully, at least three methods of fixing the splitting roof seams.  The dome builders even tried to tile the roof, but concluded it could not be done (and even if it could it is unclear that the domes are engineered for the vastly increased loads of tiling).  The cement of the ring beams has already been set improperly and built into the domes, and there appears to be no practicable method of chipping out all the concrete and somehow resetting new concrete properly without tearing down the rest of the structures.  The only arguable solution for the inherent flaws in the walls is to build another wall outside of the existing wall, which would not harmonize with the rest of the domes' construction, and which would be equivalent to completely rebuilding the walls.  Moreover, NCC is entitled to fixes, if any exist, that would be acceptable to it and consistent with what it bargained for.  The only practical solution is  demolition of existing structures to build new, adequate and safe structures of comparable size.

6.  NCC's expectations of longevity, durability, and cost-effectiveness as generated by the dome builders' written promises have been eliminated.  Instead of being a community refuge for force five tornados as promised, the domes may actually need to be torn down to protect the community.

7.  The acts and omissions of the dome builders, the engineers, and Mehler have combined to cause indivisible and substantial injuries and damages to NCC.  NCC's damages continue to build daily as weather, sunshine, and time continue to have an impact.

## II.
## PARTIES

8.  NCC has used best efforts to ascertain all proper parties to this lawsuit, but due to inadequate and substandard construction documentation, NCC is unable to determine with complete certainty the identities of all responsible parties, and represents to the court that it will voluntarily add and subtract from the parties named in this lawsuit as is reasonable and proper and as further information becomes available.

9.  Plaintiff/Cross-Plaintiff NORTHVIEW CHRISTIAN CHURCH, INC. is an Alabama nonprofit corporation with its principal place of business in Alabama.

10. Plaintiff/Counter-Defendant/Cross-Defendant MEHLER TEXNOLOGIES, INC. is a Virginia corporation with its principal place of business in Virginia, and may be served with process through its registered agent Martha White Medley at 106 East Main Street, Second Floor, Martinsville, Virginia, 24114, or wherever she may be found.

11. Defendant/Counter-Plaintiff    MONOLITHIC    CONSTRUCTORS,    INC.    d/b/a MONOLITHIC DOME INSTITUTE is an Idaho corporation with its principal place of business in Texas, and may be served with process through its registered agent David B. South at 177 Dome Park Place Suite 1, Italy, Texas, 76651-3711, or wherever he may be found.

12. Defendant/Counter-Plaintiff MONOLITHIC HOLDINGS, INC. is a Texas corporation with its principal place of business in Texas, and may be served with process through its registered agent David B. South at 177 Dome Park Place, Italy, Texas, 76651, or wherever he may be found.

13. Defendant/Counter-Plaintiff MONOLITHIC, INC. is a Texas corporation with its principal place of business in Texas, and may be served with process through its registered agent David B. South at 177 Dome Park Place, Italy, Texas, 76651, or wherever he may be found.

14. Defendant DAVID B. SOUTH, an individual and a citizen of the State of Texas, may be served with process at 177 Dome Park Place, Italy, Texas, 76651, or wherever he may be found.

15. Defendant SOUTH INDUSTRIES, INC. d/b/a SOUTH INDUSTRIES USA, INC. is an Idaho corporation with its principal place of business in Idaho, and may be served with process through its registered agent David B. South at 177 Dome Park Place, Italy, Texas, 76651, or wherever he may be found.

16. Defendant SOUTH INDUSTRIES INTERNATIONAL, INC. is an Idaho corporation with its principal place of business in Idaho, and may be served with process through its registered agent Randy South at 910 Twin Butte Road, Menan, Idaho, 83434, or wherever he may be found.

17. Defendant RANDY SOUTH, an individual and a citizen of the State of Idaho, may be served with process at 910 Twin Butte Road, Menan, Idaho, 83434, or wherever he may be found.

18. Defendant ANDREW SOUTH, an individual and a citizen of the State of Idaho, may be served with process at 910 Twin Butte Road, Menan, Idaho, 83434, or wherever he may be found.

19. Defendant JOSHUA SOUTH, an individual and a citizen of the State of Idaho, may be served with process at 910 Twin Butte Road, Menan, Idaho, 83434, or wherever he may be found.

20. Defendant DEREK SOUTH, an individual and a citizen of the State of Idaho, may be served with process at 910 Twin Butte Road, Menan, Idaho, 83434, or wherever he may be found.

21. Defendant LPDJ ARCHITECTS, LLC is a Utah limited liability company with its principal place of business in Utah, and may be served with process through its registered agent Jesse M. Harris at 1409 S. 600 W., Suite D, Bountiful, Utah, 84010, or wherever he may be found.

22. Defendant LELAND A. GRAY, an individual and a citizen of the State of Utah, may be served with process at 2830 South Beverly, Salt Lake City, Utah, 84106, or wherever he may be found.

23. Defendant JESSE M. HARRIS, an individual and a citizen of the State of Utah, may be served with process at 1409 S. 600 W., Suite D, Bountiful, Utah, 84010, or wherever he may be found.

24. Defendant J & J GROUP, INC. is an Idaho corporation with its principal place of business in Idaho, and may be served with process through its registered agent Jason P. South at 4943 North 29th East, Suite A, Idaho Falls, Idaho, 83401, or wherever he may be found.

25. Defendant JASON SOUTH, an individual and a citizen of the State of Idaho, may be served with process at 4943 North 29th East, Suite A, Idaho Falls, Idaho, 83401, or wherever he may be found.

26. Defendant   MECHANICAL   SYSTEM   SOLUTIONS   GROUP   PLLC   d/b/a ENGINEERING SYSTEM SOLUTIONS is an Idaho limited liability company with its principal place of business in Idaho, and may be served with process through its registered agent Justin R. Judy at 4943 North 29th East, Suite A, Idaho Falls, Idaho, 83401, or wherever he may be found.

27. Defendant ENGINEERING STRUCTURAL DETAILING, LLC d/b/a ENGINEERING SYSTEM SOLUTIONS is an Idaho limited liability company with its principal place of business in Idaho, and may be served with process through its registered agent Jeremy J. Klein at 4943 North 29th East, Suite A, Idaho Falls, Idaho, 83401, or wherever he may be found.

28. Defendant MS2EE, PLLC d/b/a ENGINEERING SYSTEM SOLUTIONS is an Idaho limited liability company with its principal place of business in Idaho, and may be served with process through its registered agent Sean R. Moulton at 60 East Wallace, Driggs, Idaho, 83422, or wherever he may be found.

29. Defendant E & D COMPANY, PLLC d/b/a ENGINEERING SYSTEM SOLUTIONS is an Idaho limited liability company with its principal place of business in Idaho, and may be served with process through its registered agent Douglas H. Weber at 4943 North 29th East, Suite A, Idaho Falls, Idaho, 83401, or wherever he may be found.

30. Defendant ROYAL ENGINEERING, INC. is a Utah corporation with its principal place of business in Utah, and may be served with process through its registered agent Steve Griffiths at 2335 South State Street, Suite 225, Provo, Utah, 84606, or wherever he may be found.

**III.**
**JURISDICTION AND VENUE**

31. This Court has independent subject matter jurisdiction over this action based upon diversity of citizenship.  See 28 U.S.C. § 1332.  Under the jurisdictional statute, the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs,

and is between citizens of different states, as NCC is not a resident of the same state as any Cross-Defendant or Defendant.  See id.

32. Venue in the United States District Court for the Northern District of Texas, Dallas Division is proper because Cross-Defendant and Defendants are residents of multiple states, namely, Texas, Virginia, Utah, and Idaho, and at least one is subject to personal jurisdiction in this District at the time of commencement of this action.  See 28 U.S.C. § 1391(a)(3).

**IV.**
**CONDITIONS PRECEDENT**

33. All conditions precedent have been performed or have occurred.

**V.**
**FACTUAL BACKGROUND**

34. This action by Northview Christian Church ("NCC") is about a construction project that was negotiated in 2005, constructed from September, 2007 to June, 2008 (exterior), and occupied on or about December 31, 2008 (after the interior was finished by non-parties).  The design and construction flaws of the two domes are so significant that they undermine the entire undertaking of the construction project.  Mehler, the dome builders, and the engineers are responsible for said design and construction flaws, which involve the crucial exterior "shells" of NCC's two domes.

**A.  BASIC BACKGROUND**

35. NCC is a large church headquartered in Dothan, which is at the southeastern corner of Alabama near Georgia and Florida within about eighty (80) driving miles of the Gulf of Mexico. NCC has approximately two-thousand (2,000) members in Dothan, and another seven hundred (700) members at its second location about one-hundred (100) miles away in Montgomery, Alabama.  Senior Pastor Dr. Hart Ramsey preaches at both locations by the use of a helicopter. Besides church services, Northview also has a Christian academy, Bible classes, a bookstore, and

a wide variety of ministries designed for children, youths, teens, teenage girls, singles, married people, women, men, seniors, prisoners, and other groups.  Northview also has a television broadcast ministry and a regional weekday television show, a media ministry, and a music and worship ministry.  Because the entire range of activity at Northview is focused upon ministering to children and adults in surrounding communities, maintaining physical facilities that are safe, inviting, comfortable, and attractive for members, visitors, students, employees, and visitors is vital.

36. NCC's desire to enhance and modernize its campus in combination with its phenomenal congregational growth in recent years prompted NCC to contact the dome builders.  Believing it was improving its campus, NCC paid the dome builders millions of dollars for two dome-shaped church buildings that in time were to be joined by at least two more matching dome structures.

37. The two domes already constructed include a large dome one-hundred ninety (190) feet in diameter, and a smaller dome one-hundred ten (110) feet in diameter.  The larger dome, or "dome 1," has the sanctuary for large gatherings including Sunday services, and houses the senior pastor's office and television studio.  The smaller dome, or "dome 3," is a multi-purpose facility used for fellowship.

38. The original plan was for dome 1 and dome 3 to be joined by dome 2 and dome 4, which were not part of the initial construction phase but together with domes 1 and 3 would form the heart of the NCC campus with a uniform theme.  Domes 2 and 4 were to be for children's ministries and youth, and were to also feature a gymnasium.

## B.  SINGLE BUSINESS OF THE DOME BUILDERS & MONOLITHIC DOME CONCEPT

39. The dome builders held themselves out to NCC in early stages of the project as a single business, joint venture, joint enterprise, or partnership with respect to the design and construction

of the domes in Dothan, and NCC believed the dome builders were all part of the same entity. The dome builders operate in a close-knit network, and most of them are in the South family originally from Idaho.  By leading NCC to believe they were the same organization, they ensured mutual profits from NCC.

40. Monolithic, South, their principals David South, Randy South, Andrew South, Joshua South, and Derek South, and other members of the South family largely designed and built all of the crucial components that could be summarized as the exteriors of NCC's domes, to wit, the roofs, supporting ring beams, and walls.  The "monolithic" dome is a proprietary construction concept designed and developed by the South "family business."

41. Years ago in Idaho, brothers David, Barry, and Randy South formed the predecessor to South Industries, South's Incorporated, and pioneered the concept now known and registered with the U.S. Patent and Trademark Office as the "monolithic" dome, using an "airform," which is also a registered trademark.  To make a "monolithic" dome of the variety constructed for NCC, the dome builders purchase coated fabric membrane (e.g. from Mehler) and weld it together to form a custom shape tailored to the size of the dome to be constructed.  The airform is attached to the top of a circular wall and inflated like a balloon.  While the air pressure keeps the airform inflated in the dome shape, workers spray insulation from the inside to coat the airform, install rebars, and finally spray concrete over the insulation and rebars.  The airform becomes the exterior layer of protection from the sun, wind, and rain.

42. After designing the essentials of the monolithic dome concept, the South brothers formed the entities now known as South and Monolithic.  David South came to Texas to run Monolithic, leaving his brother Randy in Idaho to run South with several of his seven sons including Andrew, Joshua, and Derek.

43. Custom building domes is still a "family business" for the Souths.  As the websites of Monolithic and South explain and NCC can verify, Monolithic and South continue to work hand in hand to build monolithic domes.  Monolithic maintains South's website, which states that Monolithic is "the information-generating and educational branch of the Monolithic family."

44. LPDJ is apparently another branch of the Monolithic family.  In communications with NCC, Monolithic referred to LPDJ as Monolithic's "architectural wing."  Lee Gray of LPDJ even spoke to NCC's congregation in order to promote the monolithic dome concept.  NCC believed that when it was working with LPDJ for the design of the domes it was working with Monolithic.

45. NCC initially paid Monolithic six thousand dollars ($6,000.00) for a feasibility study pursuant to an agreement on Monolithic's letterhead, and the resulting feasibility study had LPDJ's name at the bottom.  Later when problems with the domes began to surface and LPDJ began discounting the amounts due and owing, it was LPDJ, not Monolithic, that refunded NCC's original payment for the feasibility study.  The responsibilities of Monolithic and LPDJ were conflated in documentation, because they worked together indistinguishably.

46. When NCC's construction project turned into a disaster, the dome builders and their technically distinct organizations changed their tune.  Instead of sounding like the same business, the dome builders began blaming each other for problems.

## C.  DOME BUILDER REPRESENTATIONS ABOUT DOME PROJECT

47. The project began in about January, 2005 when NCC Senior Pastor Dr. Hart Ramsey entered into communications with the dome builders about the possibility of constructing new building facilities.

48. The dome builders induced NCC to enter into an agreement with them by promising NCC what NCC was looking for in new construction.  NCC's location in Alabama near the Gulf

of Mexico is subject to severe weather disturbances, such as hurricanes or tornados.  The dome

builders promised NCC in writing on or about July 1, 2005 and also on or about January 10,

2006 (unless otherwise noted) that NCC's domes would:

- "resist a 'Force 5 Tornado (300 miles/hour winds)' and provide maximum safety for the building inhabitants";

- "be the most stable, reliable, and durable construction available";

- "last[] for centuries";

- "finish[] out at about $100 per square foot" (January 26, 2005);

- be "the strongest, best-insulated, and least expensive free span structures";

- "reduce[] the cost of heating and cooling by up to 40-60% . . . compared to other conventional construction"; and

- be comparable in elegance and longevity to "Ancient buildings such as Haggis Sophia in Turkey and the Pantheon in Rome."

49. A newspaper article and an NCC press release each showed how the dome builders'

representations about durability, longevity, elegance, cost-effectiveness, and ability of the domes

to withstand tornadoes and other elements served as the basis of the bargain for NCC.

50. "Dome Sweet Dome," a May 3, 2008 newspaper article, reported that NCC Pastor Dr.

Hart Ramsey understood that the domes would be more cost efficient to build than conventional

structures, use less energy, and are "easy to maintain."  "But the real kicker" for NCC deciding

to build the domes was the "durability factor."  Pastor Ramsey was told that the "building is

touted as fire safe, tornado and earthquake resistant" in the midst of then recent hurricanes in the

Florida and Louisiana area.  Pastor Ramsey was quoted as saying that "Research shows [the

domes] can withstand an F-5 tornado," and that "The entire community is welcome to use the

shelter in the event of bad weather."   As a result of this article and other representations to the public, the Dothan community now knows NCC as the place to gain shelter from a force five tornado and other natural disasters or dangers.

51. In its April 29, 2008 press release, NCC noted that monolithic domes are "known for their ability to meet Federal Emergency Management Agency's standards for near-absolute protection from tornados."   The press release touted the monolithic dome's usefulness as a tornado shelter, and stated that it qualifies for FEMA's "highest designation, defined as offering near-absolute protection from natural disasters."   David South of Monolithic was quoted in the press release as saying that "The deadly tornado that we saw recently in Virginia underscores the advantages of building a Monolithic Dome. . . .   In every case where a dome has been in the path of a tornado or hurricane, the building has sustained no structural damage," and "Monolithic Domes can be significantly less expensive to build than a traditional structure of the same size," and that "They also have the additional benefits of having low utility costs and being forever-type structures.   In every case where records have been kept and checked, it can be shown that utility savings over 20 years can pay for the entire facility."

52. NCC not only relied upon the dome builders' well documented promises as the material bases for entering into the building project transaction with the dome builders, but also communicated the dome builders' promises about the domes to the community in order to generate support and funding for the project, and enhance NCC's image in the community.

**D.  COST AND DOCUMENTATION FOR THE CONSTRUCTION PROJECT**

53. On or about July 1, 2005 after paying the dome builders to conduct a feasibility study, NCC received a description of the construction project and a detailed budget that would form the contract between NCC and the dome builders.   The total cost of the project was initially five-million, six-hundred thousand dollars ($5,600,000.00), and increased on or about January 10,

2006 to six-million one-hundred thirty-five thousand dollars ($6,135,000.00), of which NCC paid the dome builders approximately two-million, one-hundred fifty-two thousand, one-hundred forty-nine dollars and thirty-nine cents ($2,152,149.39) for the basic exterior shells of the two dome buildings.  The remaining budgeted amounts were paid to other contractors to install doors and windows and finish out the interior.

54. The contract between NCC and the dome builders was informal, and not executed on industry-standard documents.  The essential contract was agreed to after July 1, 2005 when NCC accepted the terms of the feasibility study documents, which contained the essentials of the project and the prices for each portion of the project.  The prices were increased on or about January 10, 2006 in a revised feasibility study document.

55. Later on or about February 1, 2006, the dome builders asked NCC to sign an LPDJ document that purported to outline certain responsibilities of Monolithic and LPDJ.  On or about April 29, 2007, the dome builders asked NCC to sign a South document that purported to outline certain responsibilities of South, which was amended four months later on August 9, 2007 referencing a "dry stack" exterior wall.  As the project got underway, NCC was instructed to send payments to South and to LPDJ directly.

56. Although Monolithic purchased products for and performed substantial work in constructing the airforms for NCC's domes, NCC was never asked to sign any Monolithic documents other than the original feasibility study authorization, nor did NCC ever make any direct payments to Monolithic other than the six-thousand dollars ($6,000.00) for the feasibility study mentioned above.

## E.  CONSTRUCTION PROJECT

57. One of the main components and the most obvious feature of NCC's monolithic domes is the airform.  Each dome has one airform constructed of Mehler's coated fabric membrane.

Monolithic ordered large pieces of the membrane from Mehler, which Mehler shipped to Texas. In Texas, Monolithic assembled pieces of the membrane into a custom airform by welding the pieces together. Monolithic then shipped the finished airforms to Dothan to be used as a crucial component of NCC's domes, which South assembled on-site.

58. South built circular walls (including footings below them and ring beams above them) as the bases of NCC's two domes. The airforms were attached to the tops of the walls (the ring beams) and inflated like balloons. While the air pressure kept the airforms inflated in the dome shape, insulation was sprayed onto the airforms from the insides of the buildings, rebar was laid using the insulation to keep rebar hangers in place, and concrete ("shotcrete") was sprayed over the rebars as the final step in creating the essentials of the monolithic dome concept.

59. South's construction crew arrived on or about September 4, 2007. From November, 2007 through February, 2008, work temporarily stopped due to financing and permit procedures. The construction crews returned to work in February, 2008 and worked until they started leaving the site in June, 2008. The dome builders, in total, were on site at NCC for approximately six (6) months building their monolithic domes for NCC.

60. After the interiors of the domes were completed by other contractors, NCC was permitted to occupy the domes and held its first services in the domes on December 31, 2008.

**F. PROBLEMS WITH THE DOMES**

61. NCC paid millions of dollars for buildings that are wholly unacceptable and need to be torn down. The problems include the following:

- ROOFS: water intrusion, splitting seams, discoloration, fading, failure to adhere to underlying surfaces, ugliness, deficient repairs with patches and rivets, impracticability of effective repairs;

- RING BEAMS:  water intrusion, improperly set concrete, concrete deterioration such as honeycombing and pitting, mold and mildew, ugliness, impracticability of effective repairs;

- RUSTING REBARS:  rusting/oxidation of rebars in roofs, ring beams, walls;

- EVENTUAL COLLAPSE:  rusting rebars will lead to breaking loose of concrete and lack of structural integrity, which may cause dislodging of large pieces of concrete from ceilings and entire collapse of domes;

- WALLS:  water intrusion, inexplicable "dry stack" design/construction using split-faced block that is woefully substandard in the industry for preventing water intrusion and cannot practicably be fixed;

- OMISSION OF FLASHING:  failure to design/construct key flashing to prevent water intrusion around doors, windows, and other penetrations;

- FAULTY PRESSURIZATION:  faulty pressurization of the domes creating a sucking effect drawing in air and moisture;

- MOLD:  dangerous mold development in roofs, ring beams, and walls due to water intrusions;

- CORROSION OF METAL:  metal fasteners between roofs and ring beams severely corroding due to improper materials;

- DESTRUCTION OF INSULATION:  deteriorating spray-on insulation beneath compromised roofing membranes (also compromised from rivets);

- LACK OF GUTTER SYSTEM:  no design or construction of systems to divert water;

- SETTLING PROBLEMS:  water collection will cause settling, foundation problems, and problems with walls and roofs;

- INADEQUATE HVAC:   insufficient air conditioners for the dome applications, inadequate duct work for the air conditioners that will be needed, failure to install wiring and heating strips;

- LAYOUT MISTAKES:   decreased usefulness of sanctuary, main exit point from the sanctuary, and pastor's suite and television studio due to failure to follow plans;

- UNPAID CONTRACTORS:   outstanding amounts owing to local contractors from dome builders;

- INABILITY TO COMPLETE CAMPUS:   difficulty or impossibility of completing NCC campus with matching domes as originally planned;

- INCORRECT INFORMATION IN COMMUNITY:   incorrect belief in the local community that people can come to NCC in the event of a force five tornado and similar emergencies;

- REMEDIAL EXPENDITURES:   outlays by NCC of over one-hundred twenty-one thousand dollars ($121,000.00) to decrease leaking, such as for tens of thousands of feet of caulking and elastomeric coating around entire domes;

- DAMAGE TO REPUTATION:   reputations of NCC and Senior Pastor Dr. Hart Ramsey have been injured due to lack of quality of the buildings they and the dome builders promoted, embarrassment at opening services when rainwater was leaking profusely into domes;

- DECREASED DONATIONS:   decreased donations to NCC's "Salt Alliance" building fund;

- ADMINISTRATIVE DISTRACTIONS:   significant distractions to staff dealing with building problems;

- PROFESSIONAL FEES:  fees of experts, attorneys, and other professionals in pursuing legal remedies; and

- DECREASED PROPERTY VALUE:  diminution of NCC's real property value.

62. NCC's roofs are scientifically worthless under the continuing rays of the sun.  NCC has obtained an expert report from Armstrong Forensic Laboratory, Inc., which was hired by Monolithic to conduct a chemical analysis on Mehler's product believed to have been used on NCC's roofs.  The report concludes that exposure of Mehler's product to ultraviolet rays causes loss of hydrogen chloride, resulting in embrittlement, loss of mass, and volume shrinkage, leading to increased tension in the material and seam failure.

63. Repairing the problems is commercially impracticable.  The three fundamental problems are the roofs, ring beams, and walls, none of which can practicably be repaired.  The dome builders have already attempted, unsuccessfully, at least three methods of fixing the splitting roof seams.  The dome builders even tried to tile the roof, but concluded it could not be done (and even if it could it is unclear that the domes are engineered for the vastly increased loads of tiling).  The cement of the ring beams has already been set improperly and built into the domes, and there appears to be no practicable method of chipping out all the concrete and somehow resetting new concrete properly without tearing down the rest of the structures.  The only arguable solution for the inherent flaws in the walls is to build another wall outside of the existing wall, which would not harmonize with the rest of the domes' construction, and which would be equivalent to completely rebuilding the walls.  Moreover, NCC is entitled to fixes, if any exist, that would be acceptable to it and consistent with what it bargained for.  The only practical solution is demolition of existing structures to build new, adequate and safe structures of comparable size.

64. As this lawsuit is filed, problems with the domes are growing.  As time goes on, water intrusions in the roofs, ring beams, and walls cause rebars to rust, resulting in the expansion of the rebars to many times their original size and causing two key things:  (i) breaking the surrounding concrete loose; and (ii) destroying the structurally critical bond between rebar and concrete.  Because the domes are constructed with zero redundancy, a failure of a section of a ring beam or wall, or of a section of a roof can cause the entire respective dome to collapse.  Concrete can also be released before a complete collapse happens, such as from the dome roofs down to where people sit, stand, and walk below.

65. As time goes on, more moisture is introduced into roofs, ring beams and walls, leading to constantly increasing dangers from rusting rebars and mold growth.  Sunshine every day weakens the roofing membranes more and more, increasing water penetration and further increasing the dangers from rusting rebars and mold growth.

66. NCC's damages continue to mount daily as weather and time continue to have an impact, and every day the sun rises.

**VI.**
**JOINT AND SEVERAL LIABILITY, RESPONDEAT SUPERIOR, &**
**PIERCING THE CORPORATE VEIL**

67. Mehler, the dome builders, and the engineers are jointly and severally liable to NCC for all of NCC's damages prayed for herein, because all of them are joint tortfeasors that caused NCC indivisible injury.

68. Mehler, the dome builders, and the engineers are liable to NCC for acts of their employees, agents, officers, directors, and/or servants under the doctrine of respondeat superior.

69. The dome builders are jointly and severally liable to NCC whether NCC's damages sound in contract or sound in tort because:  (i) the dome builders held themselves out to NCC as a single business, joint venture, joint enterprise, or partnership with a common business purpose

with respect to the design and construction of the domes in Dothan; (ii) the dome builders functioned as a single business, joint venture, joint enterprise, or partnership with a common business purpose with respect to the design and construction of the domes in Dothan; (iii) the dome builders created a false understanding on the part of NCC that the organizations were the same or at least had a single business, joint venture, joint enterprise, or partnership with a common business purpose with respect to the design and construction of the domes in Dothan; (iv) the dome builders had actual or apparent authority to act on behalf of each other; (v) the dome builders failed to correct NCC's misunderstandings that the organizations were the same or at least had a single business, joint venture, joint enterprise, or partnership with a common business purpose with respect to the design and construction of the domes in Dothan; (vi) the dome builders gained mutual profits from NCC's belief that their organizations were the same or at least had a single business, joint venture, joint enterprise, or partnership with a common business purpose with respect to the design and construction of the domes in Dothan; (vii) the dome builders caused NCC indivisible injury as joint tortfeasors; and/or (viii) the separate corporate existences of the entities associated with the dome builders must be disregarded and the corporate veils of each of the dome builders' organizations must be pierced.

70. The corporate veils of one or more of the dome builders' various entities must be pierced. One or more of the options in the preceding paragraph are true about the dome builders, as they operated or appeared to operate as, and/or held themselves out to NCC as a single business, joint venture, joint enterprise, or partnership with a common business purpose with respect to the design and construction of the domes in Dothan.  One or more of the dome builders have ignored corporate goals and formalities and have treated the entity or entities as their alter ego, failed to provide adequate capitalization for the entity or entities, and/or used the entity or entities to

perpetrate a fraud upon NCC causing confusion to NCC.  Moreover, one or more of the dome builders have previously owned or operated one or more entities that are now dissolved, and in the event any such dissolved entity is liable to NCC, NCC is entitled to pursue the individual shareholders and principals of the dissolved entity in their individual capacities.  And finally, one or more of the dome builders that are natural persons have used one or more of their legal entities as their personal agents, such as in order to avoid personal liability, and have abused the forms of such legal entities.

## VII.
## CLAIMS AGAINST DOME BUILDERS

71. NCC asserts the following claims against the dome builders (as defined on page two), jointly and severally, as each described in more detail below:

- **COUNT 1:  BREACH OF CONTRACT**
- **COUNT 2:  NEGLIGENCE**
- **COUNT 3:  BREACH OF IMPLIED WARRANTY**
- **COUNT 4:  UNJUST ENRICHMENT**
- **COUNT 5:  BREACH OF EXPRESS WARRANTY**
- **COUNT 6:  FRAUD**
- **COUNT 7:  PUNITIVE DAMAGES**
- **COUNT 8:  ATTORNEY'S FEES**

## COUNT 1:  BREACH OF CONTRACT

72. NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

73. NCC entered into a valid and enforceable contract with the dome builders (as defined on page two) around or about July, 2005.

74. The contract required the dome builders to design and construct two dome buildings for NCC that were supposed to meet NCC's needs, live up to the dome builders' promises, comply with applicable legal requirements and/or industry standards, conform to documentation between the parties, and meet reasonable expectations with regard to construction of new buildings.

75. The contract required the dome builders to design and construct the essentials of the dome buildings, including the footings, exterior walls, ring beams, and dome roofs.  The dome builders were essentially required to design and construct the exterior shells of the domes.  NCC hired third parties to install doors and windows and finish the interiors of the domes.

76. The contract required NCC to pay five-million, six-hundred thousand dollars ($5,600,000.00) for the design and construction of the two domes, which amount was increased in January, 2006 to six-million, one-hundred thirty-five thousand dollars ($6,135,000.00), of which the dome builders were to receive approximately two-million, one-hundred fifty-two thousand, one-hundred forty-nine dollars and thirty-nine cents ($2,152,149.39) for their part of the construction project.

77. Contract documents drafted by the dome builders and dated July 1, 2005 and January 10, 2006 (unless otherwise noted) stated in writing that NCC's domes would:  (a) "resist a 'Force 5 Tornado (300 miles/hour winds)' and provide maximum safety for the building inhabitants"; (b) "be the most stable, reliable, and durable construction available"; (c) "last[] for centuries"; (d) "finish[] out at about $100 per square foot" (January 26, 2005); (e) be "the strongest, best-insulated, and least expensive free span structures"; (f) "reduce[] the cost of heating and cooling by up to 40-60% . . . compared to other conventional construction"; and (g) be comparable in elegance and longevity to "Ancient buildings such as Haggis Sophia in Turkey and the Pantheon in Rome."

78. The dome builders failed to design and construct the buildings as agreed.

79. There are numerous instances where the design and/or construction does not meet NCC's needs, does not live up to the dome builders' promises, does not comply with applicable legal requirements and/or industry standards, does not conform to documentation between the parties, and does not meet reasonable contract expectations with regard to construction of new buildings.

80. The dome builders agreed to build domes for NCC that would be elegant aesthetically, have excellent durability and longevity, be cost effective compared to other construction alternatives, and be able to protect against water intrusion, sun rays, and even force five tornados.  None of the above are true about the domes actually constructed.

81. The roofs, exterior walls, and ring beams of the domes are the three most critical components of the entire dome structures.  The roofs have splitting seams, makeshift rivets and patches, discoloration and color fading, rusting rebars, and believed mold and mildew growth. The exterior structural walls lack proper mortar, flashing, and EIFS.  The ring beams have improperly set cement, rusting rebars, unfinished faces, pitting and honeycombing, corroding metal fasteners, and mold and mildew growth.

82. The problems with the roofs, exterior walls, and ring beams are material, and fatal to the construction.  The danger of rusting rebars and mold growth coupled with the fact that there appears to be no commercially practicable repair method for any of the problems mean the buildings must be torn down and rebuilt.

83. Contrary to written promises of the dome builders, the domes cannot withstand a force five tornado; are not the most stable, reliable, and durable construction form available; will not reduce the cost of heating and cooling by up to 40-60% compared to conventional construction if proper HVAC systems are installed; are not the least expensive free span structure; and are not

reasonably comparable in design to ancient buildings such as Haggis Sophia in Turkey and the Pantheon in Rome that have lasted many centuries.

84. The dome builders also breached their contract with NCC by:  (a) failing to submit design plans concerning exterior walls for architectural, engineering, and other professional review prior to installing same; (b) failing to properly strengthen exterior walls with appropriate re-bar overlapping so that the walls could withstand force five tornados as promised; (c) failing to place the footings of the domes deep enough into the ground so that the domes could withstand force five tornados as promised; (d) failing to use proper materials called for by construction plans in various applications, including but not limited to the metal fasteners between the airforms and ring beams (resulting in rusting and discoloration readily visible from the ground); (e) failing to conduct pre-installation conferences, prepare daily reports, follow submittal procedures, obtain documentation such as delivery tickets, record product data, and/or obtain shop drawings as required in documentation; (f) failing to conduct required quality control services such as various types of testing (e.g. concrete strength and mix, asbestos, substrate, shotcrete water to cement ratio, shotcrete application and post-application testing, pressure testing of pipes), inspections (e.g. by installers of each major component), and reports; and (g) failing to substitute various products according to procedures required by contract and law, resulting in multiple instances of non-compliant products without supporting documentation.

85. NCC has not received anything resembling the buildings agreed to be constructed. Instead, NCC has two domes with material structural integrity issues and potentially deadly mold growth, and there appears to be no commercially practicable method of repairing the problems. The domes will likely need to be torn down and rebuilt.

86. NCC has paid the dome builders all amounts due under the contract, except for certain small amounts that were waived by the dome builders in light of the problems NCC was experiencing with the domes and the need for repairs.  NCC has performed all of its obligations under its contract with the dome builders.

87. The dome builders' failure to design and construct NCC's dome buildings as agreed has caused NCC substantial damages.   NCC is entitled to all of its compensatory, direct, consequential, expectation, and other damages caused by the breaches of the dome builders, including but not limited to:  (a) restitution of all amounts paid to the dome builders, which is estimated to be at least two-million, one-hundred fifty-two thousand, one-hundred forty-nine dollars and thirty-nine cents ($2,152,149.39); (b) all amounts paid to other contractors for completing the domes, which is estimated to be at least three-million, nine-hundred eighty-two thousand, eight-hundred fifty dollars and sixty-one cents ($3,982,850.61); (c) costs to compensate still unpaid local contractors who were supposed to be paid by the dome builders; (d) mitigation costs of over one-hundred twenty-one thousand dollars ($121,000.00) to mitigate damages caused by the dome builders in order to decrease water penetration, such as costs for tens of thousands of linear feet of caulking at every joint of every dry-stacked block on the exterior walls of both domes, and costs of applying elastomeric coating to the entire surface area of the exterior walls of both domes; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain, which will include unknown costs of demolition of existing structures, and costs associated with rebuilding comparable structures, including but not limited to costs of architects, engineers, contractors, attorneys, and other professionals; (f) damages occasioned by the delay in completing the building project, which was supposed to be completed in 2008 but has not been satisfactorily completed and may not be completed for some time

pending demolition and reconstruction processes, and damages for inability to use building space contracted for during repairs, demolition, and/or reconstruction; (g) a foreseeable decline in donations to NCC's building fund for perceived quality problems with the buildings; (h) foreseeable devaluation of NCC's real property; (i) foreseeable injury to the reputations of NCC and Pastor Hart Ramsey due to the lack of quality of the buildings they and the dome builders promoted; (j) foreseeable administrative costs and professional costs associated with evaluating and addressing building problems; and (k) attorney's fees for maintaining this action.

## COUNT 2:  NEGLIGENCE

88. NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

89. The dome builders are liable to NCC for negligent design and negligent construction of NCC's domes.

90. The dome builders owed a duty to NCC to perform their contractual duties non-negligently.

91. The dome builders breached the duty they owed to NCC, *inter alia*, by failing to exercise reasonable care respecting the breaches described in Count 1 above, and also by:  (a) failing to exercise reasonable care in conducting research into accepted industry standards and alternatives concerning proper construction of and methods and materials that should be used for roofs, exterior walls, and/or ring beams that would prevent water penetration and stand up to the elements, force five tornadoes, and the sun; (b) failing to exercise reasonable care in performing or arranging for the performance of appropriate testing of the dome builders' wall design (dry-stacked split-faced block), roof design (coated fabric membrane on top of insulation, rebar, and concrete), and/or ring beam design prior to utilizing the designs as crucial parts of NCC's building project; (c) failing to exercise reasonable care in welding the seams of the airforms and

otherwise preparing the airforms for use on NCC's dome roofs, and/or failing to properly inflate, pressurize, and or maintain appropriate air pressure of the domes to ensure the seams of the airforms did not split; (d) failing to exercise reasonable care in mechanically vibrating cement (to give its integrity) when placed for the ring beams that support the dome roofs; (e) failing to exercise reasonable care in designing and constructing exterior walls with the capability of preventing water intrusion; (f) failing to exercise reasonable care in constructing and/or completing the exterior walls, roofs, and/or ring beams and associated components after the dome builders knew or should have known about problems with same (most notably water problems and aesthetic problems); (g) failing to exercise reasonable care in repairing splitting roof seams in a workmanlike manner by, for example, piercing the airform with countless rivets, placing unsightly patches over splitting seams, and beginning to install and then removing tiling causing further damage to the surface of the roof; (h) failing to exercise reasonable care in designing and constructing necessary flashing, counterflashing, and/or water handling systems with respect to the roofs, walls, and/or ring beams; (i) failing to exercise reasonable care in designing and constructing gutter or water diversion systems to prevent foundation settling due to water accumulation and other problems; (j) failing to exercise reasonable care in designing and constructing HVAC, duct work, electrical wiring, and related systems sufficient to properly heat and cool the domes; and (k) failing to exercise reasonable care in laying out the floor plans for the domes, for example resulting in decreased usefulness of the senior pastor's television studio and the main exit point of the sanctuary, and lopsidedness of the sanctuary.

92. The dome builders' breaches partially listed above constitute the cause in fact and proximate cause of NCC's damages, namely, having a defective, ugly, and potentially deadly

building, a result that is reasonably foreseeable by a series of negligent acts in designing and constructing buildings.

93. As a result of the dome builders' negligence, NCC has sustained substantial injuries including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors who were supposed to be paid by the dome builders; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 3:  BREACH OF IMPLIED WARRANTY

94. NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

95. The dome builders sold to NCC their services for the design and construction of dome shaped buildings on NCC's property.

96. The dome builders failed to perform the services in a good and workmanlike manner, as set forth in Count 1 and Count 2 above, for example.

97. As a direct result of the dome builders' breaches, NCC has two domes that have material structural integrity issues and potentially deadly mold growth, and there appears to be no commercially practicable method of repairing the problems.

98. NCC has sustained substantial injuries including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts

paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors who were supposed to be paid by the dome builders; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 4:  UNJUST ENRICHMENT

99. NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

100.        NCC is entitled to its money back.

101.        NCC paid the dome builders an approximate total of two-million, one-hundred fifty-two thousand, one-hundred forty-nine dollars and thirty-nine cents ($2,152,149.39).

102.        The dome builders have been unjustly enriched by the above amount paid to them by NCC, because as a direct result of the dome builders' breaches described above, NCC has two domes that have material structural integrity issues and potentially deadly mold growth, and there appears to be no commercially practicable method of repairing the problems.  NCC essentially got nothing in return for its payments to the dome builders, because it will likely need to tear down the domes.

103.        NCC is entitled to restitution in equity of all amounts paid to the dome builders.

## COUNT 5:  BREACH OF EXPRESS WARRANTY

104.        NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

105.        The dome builders are liable to NCC for breach of express oral and written warranties about NCC's domes.

106.     The dome builders sold their services of designing and constructing dome buildings to NCC.

107.     The dome builders promised that the domes they would build NCC would be elegant aesthetically, have excellent durability and longevity, be cost effective compared to other construction alternatives, and be able to protect against water intrusion, sun rays, and even force five tornados.

108.     NCC has not received anything resembling the buildings promised.  Instead, NCC has two domes that have material structural integrity issues and potentially deadly mold growth, and there appears to be no commercially practicable method of repairing the problems.  The domes will likely need to be torn down and rebuilt.

109.     Contract documents drafted by the dome builders and dated July 1, 2005 and January 10, 2006 (unless otherwise noted) stated in writing that NCC's domes would:  (a) "resist a 'Force 5 Tornado (300 miles/hour winds)' and provide maximum safety for the building inhabitants"; (b) "be the most stable, reliable, and durable construction available"; (c) "last[] for centuries"; (d) "finish[] out at about $100 per square foot" (January 26, 2005); (e) be "the strongest, best-insulated, and least expensive free span structures"; (f) "reduce[] the cost of heating and cooling by up to 40-60% . . . compared to other conventional construction"; and (g) be comparable in elegance and longevity to "Ancient buildings such as Haggis Sophia in Turkey and the Pantheon in Rome."  The foregoing representations served as the basis of the bargain for NCC, as demonstrated in a press release by NCC dated April 29, 2008, and in a newspaper article dated May 3, 2008 explaining the reasons for NCC's desire to construct the domes.

110.     The actual construction does not live up to the dome builders' warranties.  On information and belief, the domes cannot withstand a force five tornado; are not the most stable,

reliable, and durable construction form available; will not reduce the cost of heating and cooling by up to 40-60% compared to conventional construction if proper HVAC systems are installed; are not the least expensive free span structure; and are not reasonably comparable in design to ancient buildings such as Haggis Sophia in Turkey and the Pantheon in Rome that have lasted many centuries.

111.     As a direct and proximate result of the dome builders' breaches of express warranties, NCC has sustained at least the following damages (discussed in more detail above): (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors who were supposed to be paid by the dome builders; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 6:  FRAUD

112.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

113.     NCC is entitled to recover against the dome builders for fraud.  The buildings the dome builders delivered fall woefully short of what was promised.

114.     The dome builders promised that the domes they would build NCC would be elegant aesthetically, have excellent durability and longevity, be cost effective compared to other construction alternatives, and be able to protect against water intrusion, sun rays, and even force five tornados.

115.     NCC has not received anything resembling the buildings promised.  Instead, NCC has two domes that may have material structural integrity issues and potentially deadly mold growth, and there appears to be no commercially practicable method of repairing the problems. The domes will likely need to be torn down and rebuilt.

116.     More specifically, contract documents drafted by the dome builders and dated July 1, 2005 and January 10, 2006 (unless otherwise noted) stated in writing that NCC's domes would:  (a) "resist a 'Force 5 Tornado (300 miles/hour winds)' and provide maximum safety for the building inhabitants"; (b) "be the most stable, reliable, and durable construction available"; (c) "last[] for centuries"; (d) "finish[] out at about $100 per square foot" (January 26, 2005); (e) be "the strongest, best-insulated, and least expensive free span structures"; (f) "reduce[] the cost of heating and cooling by up to 40-60% . . . compared to other conventional construction"; and (g) be comparable in elegance and longevity to "Ancient buildings such as Haggis Sophia in Turkey and the Pantheon in Rome."

117.     The foregoing representations served as material inducements and the basis of the bargain for NCC, as demonstrated in a press release by NCC dated April 29, 2008, and in a newspaper article dated May 3, 2008 explaining the reasons for NCC's desire to construct the domes.

118.     When the dome builders made the above written representations, the dome builders intended that NCC act upon them by accepting the terms of the contract for the dome builders to construct dome buildings.

119.     The dome builders made the representations recklessly without knowledge of their truth, and had not conducted appropriate research in order to verify the assertions made.

120.     As a direct and proximate result of the dome builders' fraud, NCC has sustained at least the following damages (discussed in more detail above):  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors who were supposed to be paid by the dome builders; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 7:  PUNITIVE DAMAGES

121.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

122.     Northview is entitled to punitive damages from the dome builders, because the frauds and misrepresentations described above, proximately causing significant damage to Northview, were intentional.  The dome builders intentionally misrepresented material facts in order to induce Northview to act on a business deal that the dome builders knew all along was not going to produce the results that NCC desired and the dome builders promoted.

## COUNT 8:  ATTORNEY'S FEES

123.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

124.     NCC is entitled to its reasonable and necessary attorney's fees from the dome builders either in equity as damages, or pursuant to applicable statutes and/or common law.

## VIII.
## CLAIM AGAINST LPDJ (ONLY)

125.     In addition to the claims against LPDJ (as defined on page two) contained in Counts 1-8 above, NCC also asserts the following claim against LPDJ as described in more detail below:

- **COUNT 9:  ARCHITECTURAL MALPRACTICE**

### COUNT 9:  ARCHITECTURAL MALPRACTICE

126.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

127.     LPDJ committed architectural malpractice concerning NCC's construction project, and is liable to NCC for damages.

128.     LPDJ owed a duty to NCC based upon:  (a) LPDJ's professional status and state licensure; (b) LPDJ's undertaking to perform professional architectural, design, and/or engineering services for NCC; and/or (c) LPDJ's contractual relationship with NCC whereby LDPJ owed a duty to NCC to perform its contractual duties non-negligently.

129.     LPDJ committed acts and omissions that resulted in designs, plans, and/or specifications for NCC's building project that deviated from locally prevailing standards of architectural practice.

130.     LPDJ violated the duty owed to NCC to exercise ordinary care and diligence exercised by other architects in the same or similar circumstances, and was negligent in at least the following particulars:  (a) failing to exercise reasonable care in conducting research into accepted industry standards and alternatives concerning proper designs, methods, and materials that should be used for roofs, exterior walls, and/or ring beams that would prevent water penetration and stand up to the elements and the sun; (b) failing to exercise reasonable care in

supervising the construction process; (c) failing to performing or arranging for the performance of appropriate testing of the wall design (dry-stacked split-faced block), roof design (coated fabric membrane on top of insulation, rebar, and concrete), and/or ring beam design; (d) failing to exercise reasonable care in designing exterior walls with the capability of preventing water intrusion; (e) failing to exercise reasonable care in correcting known design problems associated with exterior walls, roofs, and/or ring beams and associated components after the problems began to appear; (f) failing to exercise reasonable care in designing necessary flashing, counterflashing, and/or water handling systems with respect to the roofs, walls, and/or ring beams; (g) failing to exercise reasonable care in designing gutter or water diversion systems to prevent foundation settling due to water accumulation and other problems; (h) failing to exercise reasonable care in designing HVAC, duct work, electrical wiring, and related systems sufficient to properly heat and cool the domes; (i) failing to exercise reasonable care in submitting designs for reasonable review by appropriate professionals such as engineers; (j) failing to exercise reasonable care in performing the professional tasks and generating appropriate documentation required for projects like NCC's dome project; (k) failing to exercise reasonable care in designing exterior walls with appropriate re-bar overlapping so that the walls could withstand force five tornados as promised; (l) failing to exercise reasonable care in designing the footings of the domes to be placed deep enough into the ground so that the domes could withstand force five tornados as promised; and (m) failing to conduct required conferences with the other dome builders and the owner NCC.

131.     LPDJ's breaches partially listed above constitute the cause in fact and proximate cause of NCC's damages, namely, having a defective, ugly, and potentially deadly building, a result that is reasonably foreseeable by a negligent act in designing a building.

132.     As a result of LPDJ's professional negligence, NCC has sustained substantial damages including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## IX.
## CLAIMS AGAINST ENGINEERS

133.     NCC asserts the following claims against the engineers (as defined on page two), jointly and severally, as each described in more detail below:

- **COUNT 10:  ENGINEERING MALPRACTICE**
- **COUNT 11:  BREACH OF CONTRACT**
- **COUNT 12:  ATTORNEY'S FEES**

## COUNT 10:  ENGINEERING MALPRACTICE

134.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

135.     Each of the engineers (as defined on page two) owed a duty to NCC based upon: (a) each of the engineers' professional status and state licensure; (b) each of the engineers' undertaking to perform professional engineering/design services for NCC; and/or (c) each of the engineers' contractual relationship with one or more of the dome builders whereby each engineer owed a duty to NCC as third-party beneficiary to perform the engineer's duties under the contract non-negligently.

136.     Each engineer performed or failed to perform the engineer's professional duties in a way that deviated from locally prevailing standards concerning engineering and design.

137.     Each engineer violated the duty owed to NCC to exercise ordinary care and diligence exercised by other engineers in the same or similar circumstances, and was negligent in at least the following particulars:  (a) failing to prepare or provide the owner NCC with critical engineered shop drawings pertaining to fundamental elements of NCC's dome buildings; (b) failing to properly evaluate the needs for, and adequately design and engineer exterior structural walls, dome roofs, and ring beams; (c) failing to incorporate appropriate designs for electrical, heating, and cooling elements of the construction project; (d) failing to design and engineer structural elements of NCC's buildings consistent with being able to withstand force five tornados and high winds, and in compliance with the durability and other important features of the buildings according to the promises of the dome builders; and (e) other matters that will be disclosed upon discovery of further documentation not yet made available to NCC.

138.     The breaches partially listed above constitute the cause in fact and proximate cause of NCC's damages, namely, having a defective, ugly, and potentially deadly building, a result that is reasonably foreseeable by a negligent act in designing and engineering a building.

139.     As a result of each engineers' professional negligence, NCC has sustained substantial damages including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in

donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 11:  BREACH OF CONTRACT

140.	NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

141.	Each of the engineers J&J, MSSG, ESD, MS2EE, E&D, and Royal entered into one or more contracts with the dome builders or one or more of the parties that comprise the dome builders whereby the engineers were to perform certain design or engineering related tasks pertaining to NCC's dome building project in Dothan, Alabama.

142.	NCC was an intended third-party beneficiary of the engineer-dome builder contract/s.  The dome builders were never intended to be the beneficiaries of the engineers' services; rather, the engineers' services were always known and intended by the contracting parties to be for the benefit of NCC and NCC's construction project.  All contracting parties understood that they were all at all relevant times in the business of performing professional services for third-parties, which in this case was NCC.

143.	The basis of the contract/s between the dome builders and the engineers was the professional design and engineering services of the engineers, which were to be used to design dome buildings for NCC that would meet reasonable legal and industry standards and requirements.

144.	The engineers breached their contract/s with the dome builders by failing to perform the professional tasks and responsibilities necessary, expected as a matter of industry standard, and express or implied in contract to be performed with respect to the type and nature of the building project at NCC.

145.     Specifically, by way of illustration only and not as an exhaustive list, the engineers failed to:  (a) prepare or provide the owner NCC with critical engineered shop drawings pertaining to fundamental elements of NCC's dome buildings; (b) properly evaluate the needs for, and adequately design and engineer exterior structural walls, dome roofs, and ring beams; (c) incorporate appropriate designs for electrical, heating, and cooling elements of the construction project; and (d) perform other acts and/or omissions that will be disclosed upon discovery of further documentation not yet made available to NCC.

146.     As a result of each engineers' breach/es, NCC has sustained substantial damages including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 12:  ATTORNEY'S FEES

147.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

148.     NCC is entitled to its reasonable and necessary attorney's fees from the engineers, jointly and severally, either in equity as damages, or pursuant to applicable statutes and/or common law.

**X.**
## CLAIMS AGAINST MEHLER

149.     NCC asserts the following claims against Mehler (as defined on page two) as each

described in more detail below:

- **COUNT 13:  PRODUCTS LIABILITY**
- **COUNT 14:  BREACH OF CONTRACT**
- **COUNT 15:  BREACH OF CONTRACT WARRANTIES**
- **COUNT 16:  ATTORNEY'S FEES**

## COUNT 13:  PRODUCTS LIABILITY

150.     NCC realleges and incorporates by reference the allegations set forth in the

foregoing paragraphs of this complaint.

151.     Mehler is liable to NCC for a manufacturing defect and/or a design defect of

Mehler's product.

152.     Mehler commercially manufactured and supplied and sold a product that can be

described as a coated fabric or textile.

153.     At all times relevant to this lawsuit, Mehler was engaged in the business of

manufacturing and selling said product.

154.     On its website (www.mehler-texnologies.com), Mehler advertises many purposes

for the product, one of which is "textile construction," which Mehler describes as "Membranes

and fabrics for membrane roofings, parking place roofings, work tents."  According to Mehler's

website, such membranes and fabrics are "for textile architecture, roofing, sun protection and

tents."  The product is pictured in various roofing applications including "stretched designs,"

"frame supported designs," "air supported designs," and "tents."  According to Mehler, the

product is expected to be used in "large constructions" and "large area designs such as stadium

roofings."  Mehler promises the product will "resist extreme climate conditions," and "maintain unique appearance over long periods."  "High tear-out forces, special continued tear-out forces and the excellent weldability of the material," Mehler explains, "are designed for the extreme pull and pressure forces of stretched designs."  Air supported designs involving inflation of the product "are installed quickly, can cover large areas and do not need support constructions."  Tent designs quickly installed and dismantled are said to be useful for "weather protections."  Mehler repeatedly touts the product's weldability on its website.

155.     As shown by its website and elsewhere, Mehler could and did foresee that consumers like NCC would use Mehler's product.  Further, Mehler could and did foresee that consumers would use the product by welding pieces of it together, inflating it, and using it as a roof to protect from the elements and the rays of the sun.  Not only did Mehler expect such uses, but it advertised them.

156.     Mehler also impliedly warranted that its product is of a level of quality generally acceptable among those who deal in similar goods.

157.     Mehler's warranties and representations concerning its product on its website and elsewhere constituted an express, or at least an implied warranty that its product would be suitable for welding, inflating, and use as a roof, and that when used as a roof it would be suitable for reasonably expected protection under exposure to the sun, wind, and rain, and would be able to last for a reasonable amount of time under the sun, wind, and rain.  Such basic assumptions about Mehler's product served as the basis of the bargain for purchasing Mehler's product (concerning the product that ended up at NCC), and induced the dome builders to purchase the product from Mehler.

158.     NCC was the ultimate user or consumer of Mehler's product.  NCC contracted with the dome builders to build dome buildings for NCC.  The dome builders purchased from Mehler the product discussed above, and used it to form NCC's dome roofs.

159.     The dome builders assembled NCC's dome roofs by welding together pieces of Mehler's product.  Two large, dome-shaped pieces of Mehler's product resulted, which the dome builders refer to as "airforms."

160.     To build NCC's domes, the airforms were delivered to the construction site and placed in the center of what would become the dome buildings.  The dome builders attached the airforms to the walls forming the circumference of each of the domes, and inflated the airforms like a balloon to form the dome shape.  Keeping the air pressure inside the dome, insulation was sprayed on the inside of the airforms, followed by the setting of rebars, and finally concrete was sprayed over the insulation and rebars and the air pressure was removed.

161.     The airforms made from Mehler product were used as the exterior surface of NCC's domes.  The product was responsible for keeping water from penetrating into the insulation, rebar, and concrete area, and also had to stand up to the rays of the sun, winds, and other elements.

162.     Nothing the dome builders did with or to Mehler's product was not expected and even advertised by Mehler.  The dome builders did not substantially change the condition of Mehler's product as compared to its condition when it left Mehler's control.

163.     Mehler's representations about its product proved to be materially false concerning certain portions of the product that were used on NCC's dome buildings.  Either Mehler failed to use reasonable care in adequately testing its product to ensure it was capable of being used as advertised, and thereby failed to properly design its product, or Mehler failed to

use reasonable care in manufacturing at least a portion of its product, or both. Mehler's product has failed to serve its intended uses at NCC, and has proven to be unreasonably dangerous and materially defective.

164.     According to a recent report from an expert who conducted a chemical analysis on Mehler's product, ultraviolet rays from the sun cause the product to lose hydrogen chloride, resulting in embrittlement, loss of mass, and volume shrinkage, which leads to increased tension on the material and seam failure. The material tested was supplied by the dome builders, and is believed to be the same material used on NCC's roofs.

165.     The symptoms actually observed at NCC are consistent with the expert report. After NCC's dome roofs were inflated, the seams of the airforms began splitting and continued to split over time. The dome builders and NCC also observed discoloration of the product.

166.     Also supporting the expert report are the claims of another consumer in McMinnville, Tennessee. The ISHA Foundation ("ISHA") contracted with Monolithic and South to construct a dome, the roof of which is similar to NCC's dome roofs. Monolithic and South installed Mehler's product on ISHA's dome, and ISHA claims that its dome has splitting seams most notably on the side of the dome that is exposed to the most sun.

167.     At NCC, the splitting seams have caused significant damage. One of the most important components of constructing a building that can be safe for people to use, will last a long time, and will provide a shelter from the elements is the capability of the building to control water penetration. Splitting seams on NCC's roofs allow for water intrusion.

168.     Water penetrating through the splitting seams means water can come into contact with rebars in both the roofs and the ring beams of the domes. After entering through the split seams, water trickles into the insulation beneath where rebars begin, and follows the rebars into

the concrete in the roofs.  Water also trickles down the dome roofs to the supporting ring beams, where the water can come into contact with the rebars in the ring beams, and likewise follow the rebars around the circumference of the ring beams.  The moisture causes rust or oxidation of the rebars, which then expand to many times their original size, causing two key things:  (i) breaking the surrounding concrete loose; and (ii) destroying the structurally critical bond between rebar and concrete.  Because the domes are constructed with zero redundancy, a failure of a section of a ring beam or a section of a roof can cause the entire respective dome to collapse.  Concrete can also be released even before a collapse happens, such as from the dome roofs to where people sit, stand, and walk below.

169.    The splitting seams have led to further damages to NCC's roofs through various failed repair attempts.  Confronted with the problem of splitting seams, the dome builders resorted to various techniques to stop the splitting, such as installation of rivets along the seam edges up and down the height of the domes, patches of additional pieces of product over splitting seams, and a failed attempt to adhere tiles over the top of the airform.  The rivets have only introduced additional points of entry for water intrusion, have created an eyesore.  The patches, like the rivets, are wholly unacceptable to NCC because of their unsightliness, and perhaps do not even prevent water intrusion.  The dome builders have admitted that tiling NCC's roofs will not work, even if NCC could accept such a dramatic change from what they bargained for, and removing the tiles that were initially installed has caused ugly marks and nonuniformity of the surfaces where adhesive was applied.  It appears as though there is no commercially reasonable solution for NCC's splitting seams.

170.     Because there is no commercially reasonable repair for the roof problems caused by Mehler's product, the splitting seams are more than a mere inconvenience or an increased need for repairs, because they jeopardize the entire structures of the domes at NCC.

171.     Besides the unsightliness of the splitting seams and attempted repairs thereof, both NCC and the dome builders have noticed discoloration of Mehler's product on NCC's roofs, providing further difficulties for the aesthetics of NCC's supposedly brand new campus.

172.     Mehler is liable to NCC for all of its substantial damages, which were actually and proximately caused by Mehler's product.  NCC has spent millions of dollars creating the buildings that are now essentially worthless due to the defects in Mehler's product.  NCC is now faced with demolition and rebuilding, which is expected to be costly.  To not address the problems occasioned by the splitting seams is not an option, because ignoring the problem could be deadly due to mold and breakdowns in the structural integrity of the domes.

173.     NCC has sustained substantial damages including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 14:  BREACH OF CONTRACT

174.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

175.     Mehler and Monolithic entered into one or more contracts whereby Mehler manufactured and sold to Monolithic a coated fabric product.

176.     NCC was an intended third-party beneficiary of the Mehler-Monolithic contract/s. Monolithic was never intended to be the end user of Mehler's product.  Both contracting parties knew that Monolithic was in the business of designing, building, and/or marketing dome buildings for third parties.  At all relevant times, both Mehler and Monolithic knew and intended that the product that Mehler manufactured and sold and that Monolithic purchased was for the benefit of a third-party, namely, in this situation, NCC, to use as its roof.

177.     The basis of the contract between Mehler and Monolithic was the usefulness of Mehler's product for welding together various pieces to create a custom shape suitable for use as a roof of a large structure.

178.     On its website (www.mehler-texnologies.com), Mehler advertises many purposes for the product, one of which is "textile construction," which Mehler describes as "Membranes and fabrics for membrane roofings, parking place roofings, work tents."  According to Mehler's website, such membranes and fabrics are "for textile architecture, roofing, sun protection and tents."  The product is pictured in various roofing applications including "stretched designs," "frame supported designs," "air supported designs," and "tents."  According to Mehler, the product is expected to be used in "large constructions" and "large area designs such as stadium roofings."  Mehler promises the product will "resist extreme climate conditions," and "maintain unique appearance over long periods."  "High tear-out forces, special continued tear-out forces and the excellent weldability of the material," Mehler explains, "are designed for the extreme pull and pressure forces of stretched designs."  Air supported designs involving inflation of the product "are installed quickly, can cover large areas and do not need support constructions."

Tent designs quickly installed and dismantled are said to be useful for "weather protections." Mehler repeatedly touts the product's weldability.

179.     Mehler breached its contract with Monolithic because Mehler's product as delivered to Monolithic could not be welded, inflated, and/or used as a roof to withstand the elements and the sun, as promised, and as was represented by Mehler repeatedly through its website and otherwise.

180.     Mehler's breach caused substantial injury to NCC.  NCC's roof has been compromised through splitting seams, negligent or failed repairs of said splitting seams, and discoloration.  As a result of the problems with Mehler's product on NCC's roof, NCC will be forced to spend substantial amounts of money to demolish and reconstruct the buildings featuring Mehler's products, which form a fundamental component of the buildings.

181.     NCC has sustained substantial damages including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 15:  BREACH OF CONTRACT WARRANTIES

182.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

183.     Mehler entered into a contract or a series of contracts with Monolithic whereby Mehler was to supply Monolithic with the coated fabric membrane with which Monolithic would

later form NCC's airforms for its dome roofs.  NCC is an intended third-party beneficiary of the Mehler-Monolithic contract/s (as explained in greater detail above).

184.     Mehler knew that its products would be used at NCC, or at least by a consumer like NCC.  Monolithic informed Mehler, or Mehler knew or should have known that Monolithic intended to use Mehler's product to create airforms for the roofs of large dome buildings.

185.     Mehler warranted and represented to Monolithic that Mehler's product was suitable for the roof and exterior surface of large dome structures like the domes at NCC. Mehler made such warranties and representations through various communications between the parties, and through Mehler's website (the contents of which are partially summarized above).

186.     Mehler's product as delivered to the dome builders and later to NCC is in fact not suitable for dome roofs because exposure to the sun causes the seams to split where the product is welded together for the dome roofs (according to the expert report and other information as summarized above), and perhaps for other reasons.

187.     As a direct result of Mehler's breach of contract warranties, NCC has sustained substantial damages including but not limited to the following, which are each discussed in more detail above:  (a) amounts paid to the dome builders; (b) amounts paid to other contractors for completing the domes; (c) costs to compensate still unpaid local contractors; (d) mitigation costs; (e) costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain; (f) damages occasioned by delay in completion of the building project; (g) decline in donations; (h) devaluation of real property; (i) injury to the reputations of NCC and Pastor Hart Ramsey; (j) administrative and professional costs; (k) attorney's fees; and (l) other damages.

## COUNT 16:  ATTORNEY'S FEES

188.     NCC realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this complaint.

189.     NCC is entitled to its reasonable and necessary attorney's fees from Mehler either in equity as damages, or pursuant to applicable statutes and/or common law.

## XI.
## JURY DEMAND

190.     Plaintiff NCC hereby requests a jury trial.

## XII.
## PRAYER

191.     NCC respectfully prays that this Court enter judgment in favor of NCC and against Mehler, the dome builders, and the engineers, and further prays that this Court grant to NCC against Mehler, the dome builders, and the engineers, jointly and severally, monetary damages as follows:

- Restitution of all amounts paid to the dome builders, which is estimated to be at least two-million, one-hundred fifty-two thousand, one-hundred forty-nine dollars and thirty-nine cents ($2,152,149.39);

- All amounts paid to other contractors for completing the domes, which is estimated to be at least three-million, nine-hundred eighty-two thousand, eight-hundred fifty dollars and sixty-one cents ($3,982,850.61);

- Costs to compensate still unpaid local contractors who were supposed to be paid by the dome builders;

- Mitigation costs of over one-hundred twenty-one thousand dollars ($121,000.00) to apply tens of thousands of linear feet of caulking at every joint of every dry-stacked block on the exterior walls of both domes, to apply elastomeric coating to the entire surface area of the exterior walls of both domes, and to otherwise mitigate damages;

- Costs necessary for NCC to obtain substitute performance and obtain the benefit of the bargain, which will include unknown costs of demolition of existing structures, and costs associated with rebuilding comparable structures, including but not limited to costs of architects, engineers, contractors, attorneys, and other professionals;

- Damages occasioned by the delay in completing the building project, which was supposed to be completed in 2008 but has not been satisfactorily completed and may not be completed for some time pending demolition and reconstruction processes, and damages for inability to use building space contracted for during repairs, demolition, and/or reconstruction;

- Damages for decline in past and future donations to NCC's building fund for perceived quality problems with the buildings;

- Damages for devaluation of NCC's real property due to the construction problems and defective domes;

- Damages for injury to the reputations of NCC, Senior Pastor Dr. Hart Ramsey, and other church leadership;

- Damages for increased administrative costs to NCC in handling the building project problems and all substitute performance that will be required;

- Punitive damages as the Court deems appropriate;

- Professional costs associated with evaluating and addressing building problems;

- All of NCC's costs, expenses, and attorney's fees arising from or relating to this lawsuit;

- Pre- and post-judgment interest;
  and

- Such other and further relief to which NCC may justly be entitled.

Respectfully submitted,


By: /s/ Robert W. Rucker
    Robert W. Rucker
      Texas Bar No. 17366300
      robert@amlawteam.com
    Matt Anthony
      Texas Bar No. 01270000
      matt@amlawteam.com
    Joel B. Moore
      Texas Bar No. 24046471
      joel@amlawteam.com

    ANTHONY & MIDDLEBROOK, P.C.
    4501 Merlot Avenue
    Grapevine, TX  76051
    Tel:  972-444-8777
    Fax:  972-444-8778

    **ATTORNEYS FOR**
    **NORTHVIEW CHRISTIAN CHURCH**